# Illinois Official Reports

## Appellate Court

*People v. Dupree*, 2014 IL App (1st) 111872

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAWRENCE DUPREE, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-1872 |
| Filed<br>Rehearing denied | July 30, 2014<br>September 10, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for first degree murder and attempted first degree murder were reversed and the cause was remanded for a new trial on the ground that defendant's counsel provided ineffective assistance when he opened the door to an otherwise inadmissible prior inconsistent statement from a prosecution witness, permitted the State to repeatedly argue the statement as substantive evidence and failed to ask that the jury be given a limiting instruction on the statement, since there was a reasonable probability the result of the trial would have been different without defense counsel's errors. |
| Decision Under Review | Appeal from the Circuit Court of Cook County; No. 07-CR-146; the Hon. Michele M. Simmons, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Rachel Moran, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and William L. Toffenetti, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE MASON delivered the judgment of the court, with opinion.
Justice Neville concurred in the judgment and opinion.
Justice Pucinski specially concurred, with opinion.

**OPINION**

¶ 1 Following a jury trial, defendant Lawrence Dupree was convicted of first degree murder and attempted first degree murder and sentenced to consecutive terms of 45 and 31 years in prison for a total of 76 years. On appeal, Dupree contends that he received ineffective assistance of counsel where his trial counsel (1) opened the door to an otherwise inadmissible prior consistent statement from a witness; (2) allowed the State to introduce the statement repeatedly and, without objection, argue it as substantive evidence; and (3) failed to request that a limiting instruction be given to the jury. Dupree further contends that his mandatory 76-year sentence is unconstitutional under the Supreme Court's holding in *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), because he received a mandatory *de facto* life sentence for an offense allegedly committed when he was 17. We agree that the errors identified by Dupree require reversal and we remand for a new trial.

¶ 2 BACKGROUND

¶ 3 Shortly before 7 p.m. on October 25, 2006, the driver of a vehicle with several young men inside drove past a house in Riverdale, Illinois. Someone in the car fired multiple shots into a group of people who were standing with Darrius Collins outside the house. Christopher Linder was killed and Antonio Hammock was injured. Collins later told the police that he recognized two of the individuals in the car, Demarcus Brandon and Cordero Robinson, and that Brandon was the shooter.

¶ 4 On October 31, 2006, based on information gathered during the investigation, the police interrogated Quinten Latimer and Donald Haywood about the shooting. Both of them initially denied any involvement. Latimer eventually told the police that day that he was a passenger in the car and that Dupree was the shooter. The next day, Haywood returned to the police station and told the police that he was driving the car and Dupree was the shooter. On November 27, 2006, Dupree was arrested and charged with one count of first degree murder and one count of attempted first degree murder.

¶ 5    At trial, Hammock testified that he was at home cooking dinner on October 25 when Linder called to say that he would be stopping by on his lunch break from work. Hammock met Linder outside on the driveway. Collins and another individual joined them outside, and while they were talking, Karmen Baker, Hammock's girlfriend, also came outside.

¶ 6    A car drove past the house and Collins said, "the BDs on dummy." "BDs" meant the Black Disciples street gang. Hammock denied knowing an individual with the nickname "BD" and stated that he did not know Demarcus Brandon. "On dummy" meant they were "on garbage or about to do something." It was fairly dark outside by that time and Hammock could just see that people were in the car but could not tell who they were. The car circled the block and approached the house again. When it was about 20 feet away, Hammock saw flashes and heard gunshots.

¶ 7    Hammock pushed Baker down behind his truck that was parked in the driveway before he was hit in the legs and groin. Hammock fell to the ground and rolled over on his back. He could see Linder on the ground next to Baker and then Baker got up and ran into the house. The police and ambulances arrived and Hammock and Linder were taken from the scene in separate ambulances.

¶ 8    Baker testified that she was standing outside with Hammock, Linder, Collins and another individual on the evening of October 25 when a car drove past. Collins said the people in the car were "mean mugging." "Mean mugging" is when someone looks at you with an angry expression. Baker did not hear anyone say "BDs on dummy," but explained that phrase means somebody is "up to no good." The car came back around and Baker heard gunshots after the car turned the corner, before it reached the house. They all started running and Hammock pushed Baker down by his truck and Linder pushed her under the truck. When the shooting stopped, Baker ran into the house to get Hammock's mother and then ran back outside where she called for an ambulance.

¶ 9    Haywood testified that he was at Dupree's house on the afternoon of October 25. At approximately 5:30, Latimer arrived at the house. A short time later, Brandon Watson arrived and told the others that he had paid someone $10 to rent a car. Haywood, Dupree, Latimer and Watson were close friends. They all left the house together, and spoke to another individual outside about a group known as "the LaSalle boys," a group of friends who all lived near LaSalle Street in Riverdale. There was tension between Haywood's group of friends and the LaSalle boys.

¶ 10    Watson asked if anyone wanted to drive the car and Haywood volunteered. Although Dupree started out in the front passenger seat, Haywood stopped the car at one point and Dupree switched seats with Watson so that Dupree was sitting behind Haywood. Dupree told Haywood to drive down LaSalle Street because he wanted to see if the LaSalle boys were outside. Haywood thought that if they saw the LaSalle boys, they would get out of the car and there would be a fight.

¶ 11    When they did not see anyone out in front of the houses on LaSalle, Latimer said they should check in the back. As Haywood drove around the block a second time, he felt cold air so he knew that the window behind the driver's seat had been opened. Haywood then heard gunshots coming from inside the car, directly behind him. He drove to another location, approximately six blocks away from where he lived, and parked the car. Everyone exited the car and Dupree picked up some shell casings from the backseat and threw them in a garbage

can. Dupree then received a phone call and Haywood heard him say that he shot the wrong person and that he "didn't try to."

¶ 12    On cross-examination, defense counsel asked if Haywood told the police several days after the shooting that Latimer was the driver. Defense counsel asked additional questions about what Haywood told police during his recorded interview on October 31, 2006. The questions related to statements Haywood made regarding who suggested driving to LaSalle and when the suggestion was made. Haywood either denied making the statements or said he did not remember what he told police on that date. He said that he first denied that he was the driver but later in the same interview told the police he was driving.

¶ 13    Haywood was 20 years old at the time of the shooting, Dupree was 17, Latimer was 16 and Watson was 15. Demarcus Brandon, a friend of Haywood's, went by the nickname "BD." Haywood and his friends were not part of a gang and neither were the LaSalle boys. There was no faction of the Black Disciples street gang in the neighborhood.

¶ 14    Haywood acknowledged that at first he told the police he did not know Dupree, and then said that he had only seen him a few times. Haywood further admitted that he initially lied to the police and told them he did not know where Dupree lived. Haywood did not recall telling the police on October 31 that he did not see who put the shell casings in the garbage can or that Latimer had told them the car belonged to his mother. After pointing out additional discrepancies between Haywood's trial testimony and his October 31 statement, defense counsel asked Haywood whether his "enhanced memory" had just come to his mind in the last week.

¶ 15    On redirect, Haywood explained that he was not telling the truth on October 31 but he returned to the police station on November 1 because he wanted to tell the police what really happened. He did not remember the statements he made to police on October 31 because those statements were lies but he remembered what he told police on November 1 because that was the truth. The State made repeated references to the fact that on November 1, Haywood was telling the police the truth. The State then read questions and answers from the transcript of the November 1 interview that were consistent with Haywood's testimony at trial and repeatedly asked Haywood if that is what he told police "way back" on November 1, 2006. Defense counsel made no objections to any of the testimony related to the November 1 interview.

¶ 16    Latimer testified that he and Watson went to Dupree's house sometime in the late afternoon on October 25, 2006. After Dupree cut Latimer's hair, Latimer and Watson left in a car that Watson said belonged to his aunt. Watson drove to Haywood's house to pick up Haywood, who had a driver's license. Haywood then drove back to Dupree's house and Dupree got in the backseat of the car behind Haywood. Latimer was also sitting in the backseat on the passenger side.

¶ 17    The group drove around Riverdale for approximately 45 minutes listening to music. They then drove around the LaSalle block twice and Latimer saw a group of people outside both times. The second time, Latimer heard gunshots and ducked down because he thought the gunshots were coming from outside the car. Latimer did not hear anyone in the car say anything before the gunshots and did not see what happened.

¶ 18    After the shooting, Haywood drove over to Clark Street and parked the car. Everyone got out of the car and Latimer walked home. Latimer and Watson walked in the same direction because they lived close to one another. Latimer believed Dupree walked toward his own house but did not actually see where either Dupree or Haywood went.

¶ 19    On October 31, 2006, Latimer was taken to the police station and questioned by two detectives with his father present for the interview. The interview had been recorded and the State went through a great deal of the transcript from the interview, asking Latimer if he was asked certain questions and gave certain answers. Throughout this lengthy examination, Latimer repeatedly stated that he did not know or did not remember what he told the police on October 31. Latimer did not remember telling the police that Dupree fired the shots and that the casings from the gun landed on Latimer. Latimer testified that while he was being interviewed he was afraid because one of the detectives said that he was "trying to hit [Latimer] with the murder" and that because Latimer used the car from the murder, his fingerprints were inside the car.

¶ 20    On cross-examination, Latimer said he knew someone with the nickname "BD" and that person's first name was Demarcus. Latimer was also allowed to testify, over the State's objection, that there was tension between the LaSalle boys and the people in the car and that Haywood had previously been beaten up in a fight with the LaSalle boys.

¶ 21    Following Latimer's testimony, conversations were held outside the presence of the jury regarding the videotapes of Haywood's November 1 interview and Latimer's October 31 interview. The court ultimately ruled that it was unnecessary for the jury to see the videotape of Haywood's November 1 interview given that the State had already used the bulk of the transcript of the November 1 interview in its redirect examination of Haywood. Over defense counsel's objection, the court agreed to admonish the jury that the State had been reading from a transcript of the videotaped interview when it questioned Haywood about the November 1 interview. Also, over defense counsel's objection, the State was allowed to play the videotape of Latimer's October 31 interview in its entirety.

¶ 22    In the interview, Latimer originally told police that only he and Watson were in the car and that they parked the car on State while it was still light outside. After Latimer's father told him to tell the police what really happened, Latimer said that Haywood and Dupree were also in the car and that Watson told them that he had taken the car from a daycare center. Latimer then told police that Dupree fired the shots at Collins and some other people that he could not see and the casings landed on Latimer. Latimer was questioned about a fight that had taken place on Saturday, four days prior to the shooting. He told police that Collins was involved in the fight but that he and Dupree were not involved.

¶ 23    Detective Rich Graziano was one of the officers present for Latimer's interview. Officer Graziano testified that there had been a fight four days prior to the shooting in which Parish Jefferson was injured. He did not recall whether Demarcus Brandon, Cordero Robinson or Darrius Collins had been involved in the fight. Parish was part of the LaSalle boys, which included Hammock and Collins, while Brandon, Watson, Latimer and Haywood were part of a different group. Officer Graziano declined to label any members of either group gang members in the absence of any knowledge that they identified themselves as gang members, but acknowledged that there was an ongoing conflict between the two groups.

¶ 24    Shandrea Dyson testified that she owned the vehicle that was used in the shooting and that it had been stolen from the parking lot of her son's daycare center on October 25, 2006, when she went to pick up her son. Officer Mark Kozeluh testified that the police were able to recover the vehicle because it was equipped with an OnStar security system. Spent shell casings were recovered from the ground near the rear tire of the vehicle. Additional shell casings were recovered from a garbage can outside a house two doors away from where the car was parked.

¶ 25     Patricia Wallace, a forensic scientist with the Illinois State Police, examined the spent shell casings, fired cartridge cases, bullets and bullet jacket fragments that had been recovered from the area where the car was found, the scene of the shooting, and during the course of Linder's autopsy and determined that they were fired from two separate weapons.

¶ 26     Dupree's motion for a directed verdict at the close of the State's case was denied. Collins then testified on behalf of the defense that on October 25, 2006, he and Dupree were friends. However, Collins had problems with some people who were members of the Black Disciples street gang, including Demarcus Brandon and Cordero Robinson.

¶ 27     On the Saturday before the shooting, there was a "big old street fight" in the neighborhood. Collins, Jefferson and their friends were fighting with Brandon, Watson, Latimer and their friends. Someone hit Jefferson's mother in the face with a stick and then Jefferson's head was split open. Brandon then got a gun from his car and started shooting and everyone ran. Dupree was not involved in the fight.

¶ 28     On the evening of October 25, Collins's mother asked him to go to a nearby restaurant for her. In order to get to the restaurant, Collins had to walk past Brandon's house. Collins did not feel safe doing that after the fight, so he walked over to Hammock's house, where he saw Hammock and Linder outside and asked Hammock to give him a ride.

¶ 29     While they were standing outside, Collins saw a car come out of the alley and at first he thought it was his friend's car, but the car drove past without stopping. Collins could see someone in the backseat with his face against the window, "mugging" Collins. Collins recognized the person in the backseat as Robinson, whom he knew as "BD Cordero" because he was one of the Black Disciples, and was certain the person in the backseat was not Dupree. Collins told Hammock that something was not right and he thought they should move around because he thought the BDs were up to something. However, before they could move, the car came back around and someone in the car started shooting.

¶ 30     Collins got down on the ground in a fetal position and stayed there until the shooting stopped, then went to first Hammock and then Linder, who had both been shot. Blood was coming out of Linder's mouth, and Collins stayed with him until the police arrived. Collins then went with the police to the station and told the police that Robinson was the person he saw "mean mugging" him from the backseat of the car and that Brandon was the shooter. However, Collins acknowledged at trial that he did not actually see Brandon shooting and that he told the police Brandon was the shooter because in the previous few altercations Collins had been in with Brandon, Brandon had fired a weapon. Collins reiterated that he knew Dupree but did not see him in the car on October 25.

¶ 31     Detective William Alcott was then called as a witness for Dupree. There was only an audio recording of Haywood's October 31 interview because the video recording system was not working at the time of that interview. On direct examination, Detective Alcott confirmed that Haywood told him on October 31 that Watson and Latimer asked Haywood to take a ride over to LaSalle with them, that Latimer was driving the car and said it belonged to his mother, that Dupree was also in the car, and that after the shooting the others dropped Haywood off on his block before they parked the car.

¶ 32     On cross-examination, the State questioned Detective Alcott about the substance of the November 1 interview. Detective Alcott confirmed that Haywood came to the police station on November 1 voluntarily and indicated that he wanted to be completely truthful because there were things he had not been truthful about the previous day. Over defendant's objection, the

State was allowed to ask whether Haywood said that he had not told the truth the previous day because he did not want to have anything to do with what happened.

¶ 33 The State then asked Detective Alcott whether Haywood identified Dupree as the shooter on November 1 and defense counsel asked for a sidebar. Outside the presence of the jury, defense counsel argued that the State was going beyond the scope of direct examination and "cumulatively piling on" by bringing out all the details of the November 1 interview. The State responded that the jury was allowed to consider the November 1 interview as substantive evidence in order to determine which statement was truthful. The trial court sustained the objection to the question about whether Dupree was the shooter because no questions had been asked about that on direct examination, but ruled that the State could use the November 1 statement for impeachment. The trial resumed but the jury was not informed that the objection to the question about Dupree being the shooter had been sustained.

¶ 34 The parties stipulated that if Detective Dan Dempsey was called, he would testify that on October 27, 2006, Cordero Robinson was brought into the station for questioning and subsequently released. He would further testify that on November 1, 2006, Demarcus Brandon and Brandon Watson were interviewed separately and both were subsequently released.

¶ 35 In closing argument, the State told the jury that Haywood had not been impeached on his November 1, 2006 statement, and noted that the November 1 statement "mirrored" Haywood's trial testimony. Defense counsel did not object.

¶ 36 The jury found Dupree guilty of first degree murder and attempted first degree murder, and also found that he had personally discharged a firearm in the commission of both offenses. Dupree's motion for a new trial was denied. At the sentencing hearing, defense counsel and the trial court both acknowledged that the court had almost no discretion because of the statutory mandatory minimum and consecutive sentence requirements. The trial court sentenced Dupree to 20 years on the first degree murder charge with an additional mandatory 25 years for personally discharging a firearm, for a total of 45 years. The trial court further sentenced Dupree to 6 years on the attempted first degree murder charge with an additional mandatory 25 years for personally discharging a firearm, for a total of 31 years. Because consecutive sentences were mandatory, Dupree was sentenced to a total of 76 years. Dupree timely filed this appeal.

¶ 37 ANALYSIS

¶ 38 A. Ineffective Assistance of Counsel

¶ 39 Dupree first contends that his trial counsel provided ineffective assistance when he opened the door to an otherwise inadmissible prior consistent statement from Haywood, allowed the State to introduce the statement repeatedly and argue it as substantive evidence, and failed to request that the jury be given a limiting instruction. Dupree argues that it was not reasonable for his trial attorney to pursue a line of questioning suggesting that Haywood's trial testimony was a recent fabrication when counsel was aware that Haywood's answers in the November 1, 2006, interview were consistent with his trial testimony.

¶ 40 Ineffective assistance of counsel claims are measured against the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different. *Id*. at 687-88, 694; see also *People v. Edwards*, 195 Ill. 2d 142, 162-63 (2001). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 41    To establish that trial counsel's performance was deficient, a defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). A reviewing court is highly deferential to trial counsel on matters of trial strategy and must make every effort to consider counsel's performance from his perspective at the time, rather than in hindsight. *People v. Perry*, 224 Ill. 2d 312, 344 (2007).

¶ 42    A prior consistent statement may not be used on direct examination to enhance the credibility of a witness's testimony. *People v. Williams*, 147 Ill. 2d 173, 227 (1991). "Moreover, when a witness is impeached by means of a prior inconsistent statement, if a consistent statement does not disprove or explain the making of the inconsistent statement, it is inadmissible." *Id*. Specifically, a prior consistent statement is not admissible simply because a witness has been impeached with a prior inconsistent statement. *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 60. However, where there is a charge or inference of recent fabrication, a prior consistent statement is admissible to show that the witness told the same story before the time of the alleged fabrication. *Williams*, 147 Ill. 2d at 227. A charge of recent fabrication is not made by simply questioning a witness as to whether the witness went over his testimony or rehearsed his testimony with opposing counsel. *People v. Lambert*, 288 Ill. App. 3d 450, 455 (1997).

¶ 43    Here, defense counsel introduced Haywood's October 31 statement, a prior inconsistent statement, for impeachment purposes during cross-examination to demonstrate the discrepancies between that statement and Haywood's trial testimony. But counsel went further and, contrary to what he undoubtedly knew, implied that Haywood's "enhanced memory" was of recent vintage. This allowed the State on redirect to question Haywood about the November 1 statement, a prior consistent statement, to rebut the charge of recent fabrication. Moreover, the State also suggested to the jury that Haywood's prior consistent statement was the "truth."

¶ 44    Our review of the record convinces us that Dupree has established that his representation at trial fell below an objective standard of reasonableness. The State argues that it is clear from the record that defense counsel's strategy was to demonstrate that Haywood had given inconsistent statements to the police at the outset. In support of its position, the State cites to comments made by defense counsel during closing argument, and contends that these comments demonstrate that defense counsel's strategy was to argue that the second statement was a "deliberate frame-up" that was repeated at trial.

¶ 45    As an initial matter, we note that once the November 1 statement was admitted, defense counsel had no choice but to address it in some fashion. His suggestion in closing, therefore, that Haywood and Latimer were motivated to lay blame for the shooting on Dupree, appears to be an effort to make the best of a bad situation. But the record does not bear out that this was defense counsel's strategy from the outset. Defense counsel did not introduce the November 1 statement during Haywood's cross-examination and eventually objected to its introduction. Defense counsel also objected to the introduction of the video of Haywood's November 1 statement, conduct that is inconsistent with a presumed strategy to demonstrate that the November 1 statement was a "frame-up." Thus, the State's contention that the introduction of

Haywood's November 1 statement was part of defense counsel's strategy is not borne out by the record.

¶ 46 It is clear from the record that defense counsel's strategy in introducing the October 31 statement was to cast doubt on Haywood's credibility by demonstrating to the jury that he had initially given police a different account and pointing out the inconsistencies between that account and Haywood's trial testimony. It is equally clear from the record that defense counsel opened the door to the admission of the November 1 statement by suggesting that Haywood's trial testimony was a recent fabrication when, in fact, defense counsel was necessarily aware that Haywood's trial testimony was consistent with the November 1 statement.

¶ 47 Moreover, defense counsel never objected to the State's initial introduction of the prior consistent statement. Indeed, after expressly telling the trial court at a sidebar that the questions regarding the October 31 statement were for impeachment purposes to demonstrate the differences between that statement and Haywood's trial testimony, defense counsel merely argued that the November 1 video should not be shown because the State had already introduced large portions of the November 1 statement in its redirect examination. Defense counsel then stated that the State's introduction of the November 1 statement was "to counter my impeachment." But if defense counsel had limited his cross-examination of Haywood to his prior inconsistent statement on October 31, the State would not have been able to use Haywood's November 1 statement to "counter" that impeachment. Thus, the error committed by defense counsel resulted in placing Haywood's November 1 statement before the jury.

¶ 48 Defense counsel also erred in addressing the admissibility of Haywood's November 1 statement during the testimony of Detective Alcott. Defense counsel's direct examination of Alcott was limited to proving up aspects of Haywood's October 31 statement that Haywood either disavowed or claimed not to remember during his cross-examination. On cross-examination, the State again elicited the details of Haywood's November 1 statement from Detective Alcott. Defense counsel objected on the grounds that the questions were beyond the scope of direct examination, and again characterized the State's introduction of the November 1 statement as a "prove up" to defense counsel's impeachment of Haywood. But the State had already placed the substance of Haywood's November 1 statement before the jury when it read to Haywood from the transcript of that statement and Haywood acknowledged making the statement. Thus, there was no reason for the State to prove up anything through Alcott. So although the State's cross-examination of Alcott was, in fact, beyond the scope of defense counsel's direct, the State's effort to reintroduce the substance of Haywood's prior consistent statement during its cross-examination of Alcott was objectionable for a completely separate and more fundamental reason. Moreover, although defense counsel's objection to Alcott's testimony that Haywood identified Dupree as the shooter was sustained during a sidebar, the jury was never informed of the court's ruling, defense counsel did not bring it up again when the trial resumed, and, therefore, the jury was never instructed to disregard the answer.

¶ 49 Finally, defense counsel failed to object to the State's repeated use of the November 1 statement as substantive evidence, and failed to request that a limiting instruction be given to the jury. "Even where admissible, prior consistent statements may only be used for rehabilitative purposes; they are not admissible as substantive evidence." *People v. McWhite*, 399 Ill. App. 3d 637, 641 (2010). Our supreme court has noted that where the State argues that a prior consistent statement is the truth, and the jury is not instructed that the evidence should

be considered for a limited purpose, the statement is being used as substantive evidence. *People v. Walker*, 211 Ill. 2d 317, 345 (2004).

¶ 50    Here, the State repeatedly asked Haywood whether the November 1 statement was the "truth," without objection from defense counsel. During closing argument, the State reiterated that the November 1 statement "mirrored" Haywood's trial testimony. No limiting instruction was requested and defense counsel did not object to any of the State's references to the truth or to the State's closing argument that the November 1 statement corroborated Haywood's trial testimony. See *People v. Young*, 306 Ill. App. 3d 350, 355 (1999) (defense counsel's proof of prior consistent statements by witness adverse to defendant "introduced evidence into the trial that was otherwise inadmissible"; representation deemed ineffective); *People v. Salgado*, 263 Ill. App. 3d 238, 247-49 (1994) (finding counsel's performance deficient because he did not ask the trial court for a limiting instruction regarding the use of impeachment evidence).

¶ 51    Without defense counsel's original error in suggesting that Haywood's trial testimony was a recent fabrication when defense counsel knew it was not, the November 1 statement would have been inadmissible. Defense counsel then compounded the error by not objecting to the State's introduction of the November 1 statement as substantive evidence and not requesting that the jury be given a limiting instruction. Moreover, defense counsel did not raise a proper objection when the State introduced the November 1 statement again through Alcott when he was called as a defense witness. Defense counsel only objected that it was beyond the scope of the direct examination when, in fact, it was an inadmissible prior consistent statement and the recent fabrication exception had no applicability to Alcott's testimony. Finally, although defense counsel, in a sidebar conference, successfully objected to Alcott's testimony that Haywood identified Dupree as the shooter, he failed to request and the trial court failed to give the jury an instruction to disregard that testimony.

¶ 52    Having determined that defense counsel's performance was deficient, we must consider whether defense counsel's errors rendered the result of the trial unreliable or the proceedings fundamentally unfair. See *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). The reason prior consistent statements are prohibited is because they are likely to unfairly enhance the witness's credibility with the trier of fact simply because the statement has been repeated. *McWhite*, 399 Ill. App. 3d at 641. "The danger in prior consistent statements is that a jury is likely to attach disproportionate significance to them. People tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve." *People v. Smith*, 139 Ill. App. 3d 21, 33 (1985).

¶ 53    The improper bolstering of a witness's credibility is reversible error when the trial testimony of that witness is crucial. *Smith*, 139 Ill. App. 3d at 34. Reversible error exists even where there is competent evidence to prove a defendant's guilt beyond a reasonable doubt if the possibility exists that the improper evidence could have influenced the jury's verdict. *Id.* The most critical factor to consider in determining whether the bolstering deprived the defendant of a fair trial is whether the statement had a bearing upon his guilt or innocence. *Id.*

¶ 54    Here, the evidence against Dupree was far from compelling. No physical evidence linked him to the shooting, his fingerprints were not found in the car or on the shell casings recovered from the ground and the garbage can where Latimer told police Dupree deposited them and no weapon was recovered. Further, Dupree was not involved in a prior altercation with the LaSalle boys. The two witnesses who identified Dupree as the shooter both also admitted to being in the car at the time of the shooting and were never charged in connection with the

crimes. Moreover, Latimer was involved in the previous fight according to one witness, and Latimer testified that Haywood had been beaten up by the LaSalle boys in another fight. Collins testified that (1) he saw Cordero Robinson in the car that night, (2) he did not see Dupree, (3) he had gone to Hammock's house in an attempt to avoid Demarcus Brandon, of whom he was afraid, who was Robinson's close friend, and who had used a firearm during a previous altercation with Collins and others, and (4) he was friendly with Dupree and did not think he would have any reason to shoot him.

¶ 55 The two witnesses who identified Dupree as the shooter also provided conflicting accounts. Latimer initially told the police he was not involved at all and Haywood told one story the day he was initially taken in for questioning, but returned the next day to provide an account that was consistent with the account eventually given to the police on the previous day by Latimer. The jury's erroneous reliance on the prior consistent statement in determining Haywood's credibility at trial was made more likely by the fact that the State introduced large portions of the statement, it was likely viewed as substantive evidence by the jury because no limiting instruction was requested or given, and the State repeatedly elicited the testimony that Haywood returned to the police station to give a different account because he wanted to tell the truth. Moreover, the statement was repeated again through the testimony of Alcott.

¶ 56 Haywood's prior consistent statement was highly prejudicial because it was directly related to Dupree's guilt. Given the errors by defense counsel that allowed the State to use the November 1 statement, the failure to request a limiting instruction regarding the use of that statement and the State's conduct in urging the jury to consider the statement as the "truth," there is a reasonable probability that the outcome of a trial free of these errors would have been different. Thus, because both prongs of the *Strickland* test have been satisfied, we reverse Dupree's convictions and remand for a new trial.

¶ 57                              B. Mandatory 76-Year Sentence

¶ 58 Dupree also contends that his sentence was unconstitutional under *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), because he was 17 when the shooting occurred and the mandatory statutory minimums for the two offenses constituted a *de facto* life sentence of 76 years, of which he is required to serve 71.35 years without the possibility of parole. Because we are reversing Dupree's convictions, we need not address this argument. We note, however, that the convergence of mandatory minimum and mandatory consecutive sentences, as applied to juveniles, resulting in a sentence that exceeds the juvenile's life expectancy, raises serious constitutional issues. See *People v. Caballero*, 282 P.3d 291, 295 (Cal. 2012); *State v. Ragland*, 836 N.W.2d 107, 111 (Iowa 2013); *State v. Null*, 836 N.W.2d 41, 45 (Iowa 2013); *Commonwealth v. Brown*, 1 N.E.3d 259, 270 n.11 (Mass. 2013). Whether those issues are present here must await Dupree's retrial.

¶ 59 Finally, because we are reversing defendant's convictions and remanding for a new trial, we need not order that the mittimus be corrected.

¶ 60                                   CONCLUSION

¶ 61 For the reasons stated, we reverse defendant's convictions and remand for a new trial. After a careful review of the record, we conclude that the evidence was sufficient to convict

- 11 -

defendant of first degree murder, thus, no double jeopardy impediment to retrial is present. See *People v. Ward*, 2011 IL 108690, ¶ 50.

¶ 62        Reversed and remanded.

¶ 63        JUSTICE PUCINSKI, specially concurring.

¶ 64        I concur; however, I write separately to address defendant's constitutional challenge to this State's sentencing scheme, which in its current form, requires courts to sentence juvenile offenders convicted of certain violent crimes to terms of imprisonment that, in effect, result in mandatory *de facto* life sentences. I believe that this sentencing scheme, as applied to juvenile offenders, does not withstand constitutional scrutiny.

¶ 65        Although defendant was 17 years of age at the time of the alleged offenses, the cause was transferred from juvenile court to adult criminal court due to the severity of the charges as required by section 5-130 of the Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2006)). Furthermore, because he was prosecuted in adult criminal court, he was automatically subjected to adult sentencing provisions including: section 5-8-1(a)(1)(a) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(a) (West 2006)) (mandating a minimum sentence of "not less than 20 years[' imprisonment]" for an offender convicted of first degree murder); section 5-8-1(a)(1)(d)(iii) (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2006)) (mandating a minimum 25-year sentencing enhancement be imposed on an offender who personally discharged a firearm and caused another person's death); section 8-4(c)(1)(D) of the Criminal Code of 1961 (720 ILCS 5/8-4(c)(1)(D) (West 2006)) (mandating a minimum sentence of 31 years' imprisonment for an offender convicted of attempted first degree murder where the offender personally discharges a firearm that resulted in the great bodily harm of another person); and sections 3-6-3(a)(2)(i) and (ii) (730 ILCS 5/3-6-3(a)(2)(i)-(ii) (West 2006)) (requiring an offender convicted of first degree murder to serve 100% of his sentence without the possibility of parole and requiring an offender convicted of attempted first degree murder to serve at least 85% of his sentence before being eligible for parole). Considered as a whole, these sentencing provisions mandate that defendant will not even be eligible for parole until he has been in prison for 71.35 years, which in practical effect, is the functional equivalent of a natural life sentence. See, *e.g.*, *People v. Walker*, 392 Ill. App. 3d 277, 300 (2009) (recognizing that a 60-year sentence imposed on a 20-year-old defendant was a "*de facto* life sentence").

¶ 66        In *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), the United States Supreme Court held that any sentencing scheme calling for the mandatory imposition of a life sentence without the possibility of parole on offenders who were under the age of 18 at the time of their offense violates the eighth amendment's prohibition against cruel and unusual punishment. In so holding, the court reasoned that "children are constitutionally different from adults for purposes of sentencing" and that "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole." *Id*. at ___, 132 S. Ct. at 2464-65. Accordingly, any sentencing scheme mandating the imposition of a life sentence without possibility of parole on a juvenile offender absent any consideration of the "hallmark features" of youth including "immaturity, impetuosity, and failure to appreciate risks and consequences" runs afoul of the constitutional guarantees of the eighth amendment. *Id*. at ___, 132 S. Ct. at 2468.

¶ 67      Although I acknowledge that statutes enjoy a "strong presumption" of constitutionality (*People v. Sharpe*, 216 Ill. 2d 481, 487 (2005)), I believe that the current sentencing scheme to which defendant was subjected, which mandates the imposition of a *de facto* life sentence on a juvenile offender absent any consideration of the unique hallmark features of youth, cannot withstand constitutional scrutiny in light of *Miller*.