NOTICE
Decision filed 11/13/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 210011-U

NO. 5-21-0011

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 19-CF-343 |
| | ) | |
| JAYMOND R. PALACIO, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Vaughan and Justice Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's convictions, where the trial court did not violate defendant's constitutional rights to conflict-free counsel or counsel of choice, and posttrial counsel did not render ineffective assistance of counsel. We, however, vacate defendant's sentence for criminal damage to property to reflect his conviction on a Class A misdemeanor and remand for resentencing.

¶ 2    Following a jury trial in the circuit court of Jackson County, defendant, Jaymond R. Palacio, was convicted and found guilty of home invasion (720 ILCS 5/19-6(a)(3) (West 2016)), criminal damage to property (*id.* § 21-1(a)(1), (d)(1)(F)), and unlawful possession of a weapon by a felon (*id.* § 24-1.1(e)). The trial court sentenced defendant to 27 years in prison, followed by 3 years' mandatory supervised release. Defendant appeals, arguing that the trial court (1) violated his sixth amendment right to conflict-free counsel by denying trial counsel's motion to withdraw, where *per se* and actual conflicts of interest existed, (2) abused its discretion by denying

1

defendant's motion for a continuance to obtain new counsel, and (3) erred by sentencing defendant to six years in prison on the felony offense of criminal damage to property. Defendant also argues that trial counsel was ineffective for failing to object to inadmissible prior consistent statements and improper hearsay evidence. For the following reasons, we affirm defendant's convictions for home invasion, criminal damage to property, and unlawful possession of a weapon by a felon. We, however, vacate defendant's sentence for criminal damage to property as a Class 4 felony and remand the matter for resentencing on a Class A misdemeanor.

¶ 3                                    I. Background

¶ 4     We limit our recitation to those facts relevant to our disposition of this appeal. We recite additional facts in the analysis section as necessary to address defendant's specific arguments.

¶ 5     On August 1, 2019, the State charged defendant by information with home invasion (count I), a Class X felony (*id.* § 19-6(a)(3)), alleging that defendant, on or about July 29, 2019, knowingly entered the dwelling place of Tamira Edwards with the use of force or threatened the imminent use of force. Specifically, defendant forced open Tamira's front door, entered her dwelling place, and pointed a gun at Tamira and others, including multiple minor children, while wearing a ski mask. Next, the State charged defendant with the offense of criminal damage to property (count II), a Class 4 felony[1] (*id.* § 21-1(a)(1), (d)(1)(F)), in that defendant knowingly caused damage to Tamira's dwelling place in excess of $500. The court held a preliminary hearing on December 17, 2019, at which time the court found probable cause. Defendant pled not guilty, requested a jury trial, and the court appointed Attorney Timothy Ting to represent defendant shortly thereafter.

¶ 6     On February 24, 2020, the State filed an amended information to include the offense of unlawful possession of a weapon by a felon (count III), a Class 4 felony (*id.* § 24-1.1(e)), alleging

---

[1]At trial, the State moved to amend defendant's charge for criminal damage to property to a Class A misdemeanor, which the trial court allowed and properly instructed the jury on the misdemeanor offense.

that defendant had a previous conviction for the offense of aggravated assault in Lucas County, Ohio, on October 13, 2017, whereby defendant knowingly possessed a firearm (case No. G-4801-CR-0201702177-000). That same day, the State filed motions *in limine*, requesting the trial court find a traffic stop of defendant admissible, whereby police found defendant in possession of a black ski mask during a search incident to a traffic stop occurring on July 25, 2019. In addition, the State requested the court find evidence of defendant's October 13, 2017, criminal conviction in Ohio for aggravated assault admissible at trial for the purpose of impeaching defendant's credibility.[2]

¶ 7    On February 25, 2020, defendant filed an answer to the State's motion for pretrial discovery, filed on December 10, 2019. In his answer, defendant persisted in his plea of not guilty and asserted an alibi defense for the first time, claiming that Sharleah Williams, his girlfriend, would provide testimony at defendant's trial that she and defendant were together on July 29, 2019, at Applebee's in Carbondale, Illinois. Sharleah would testify that defendant started orientation training at Applebee's on July 29, 2019.

¶ 8    On March 2, 2020, the trial court held defendant's three-day jury trial. From the outset, the State addressed defendant's alibi defense that he raised for the first time on February 25, 2020. The State informed the court that Carbondale police investigated defendant's alleged alibi. In doing so, Sergeant Kevin Geissler of the Carbondale Police Department spoke with Mark King, the manager of Applebee's in Carbondale. Mr. King informed Sergeant Geissler that he had no record of defendant attending orientation training on July 29, 2019. Sergeant Geissler reported this

---

[2]The report of transcripts from the final status hearing on February 24, 2020, indicates that the State planned to file these two motions *in limine*. The State requested, and Attorney Ting agreed to, a motion hearing on Thursday, February 27, 2020. Relevant to this appeal, the record indicates that the trial court granted the State's motion *in limine* concerning the traffic stop, which included evidence that police stopped defendant in his car on July 25, 2019—four days before the home invasion on July 29, 2019. Following the stop, a traffic investigation took place, and police discovered a black ski mask in defendant's car.

3

information in a supplemental narrative report that the State disclosed on February 28, 2020. The State also stated that Mr. King informed the State for the first time that morning that a computerized training program at Applebee's had "some record *** that the defendant was engaged in [a] training on [an Applebee's] computer on July 29, 2019." The State could not obtain a particular time of day that defendant allegedly took the training without a subpoena. The State promptly informed Attorney Ting before preparing a proposed subpoena *duces tecum* that requested Applebee's to provide records of individuals who worked and trained at the restaurant on July 29, 2019. Attorney Ting did not object to the State's motion for leave to file a subpoena *duces tecum*.

¶ 9 Following the State's argument, Attorney Ting requested a continuance based on new information defendant disclosed to him that morning. Before providing the trial court with protected attorney-client privileged communications between counsel and defendant, Attorney Ting requested the trial court "to advise [defendant] whether or not he wishes for me to disclose the information which is confidential." The court then asked defendant if he consented to Attorney Ting disclosing confidential communications, stating:

> "But in order for the Court to hear these issues, whatever they may be, it's completely up to you. Nobody can force or threaten you into making that decision to allow your attorney to disclose them. But for him to be able to do that, you have to authorize him in court to do that, and nobody can force or threaten you into doing that, okay?"

The defendant acknowledged that he understood and that he wanted Attorney Ting to present the communications to the court that day. Defendant also acknowledged that no one forced or threatened him to make this decision. Defendant, again, acknowledged that it was his decision that Attorney Ting present the information to the court.

¶ 10 Following the trial court's admonishments, Attorney Ting informed the court that defendant disclosed to him that morning that he engaged in a physical altercation with Kyree

Taylor on July 29, 2019. Defendant also informed Attorney Ting that he could provide witnesses to the physical altercation, and that defendant "actually witnessed Mr. Taylor enter into [Tamira's] residence which is alleged to have been invaded on July 29." Attorney Ting stated that defendant's new disclosure "completely undermines [defendant's] alibi defense," indicating that defendant was confused about "the specific day" the incident took place because it had been "100 days since the time he was arrested." Attorney Ting informed the court that, prior to this disclosure, defendant never named another individual as the assailant or stated that he was present at or near Tamira's residence at the time of the alleged offense. Attorney Ting stated that "the only thing that [he] [could] somewhat look to *** substantiate what [defendant] [was] stating [was] that there was an individual that [defendant] was apparently involved in some type of dispute with" by the alias of "Cloudy," "which [he] [could] only presume [was] actually this Kyree Taylor." As such, Attorney Ting requested a continuance for the parties to investigate defendant's claims.

¶ 11    In response, the State informed the trial court that, based on defendant's most recent disclosure, it no longer wished to subpoena Applebee's for employee orientation training records. The State requested that the court deny defendant's request for a continuance and proceed to trial. Attorney Ting then informed the court that he could not "in good faith proceed with an alibi defense" since defendant indicated "that he witnessed Mr. Taylor go into the residence." In response, the State made an oral motion *in limine* requesting the court allow the State to use the transcript of Attorney Ting's disclosure to cross-examine defendant if he testified. Specifically, the State wished to inquire of defendant how he initially claimed an alibi defense and then changed his story on the first day of his trial to say that someone else committed the crimes. Attorney Ting responded stating, "I believe that's fair game," noting his belief that the State could use the confidential attorney-client information presented in court as "impeachment evidence if it were to

5

proceed to trial and defendant was to testify." The State, again, requested the court deny defendant's request for a continuance and proceed to trial.

¶ 12　Following argument by the parties, the trial court denied the State's motion for leave to issue a subpoena *duces tecum*. The court also denied defendant's motion to continue. In considering defense counsel's argument to continue defendant's trial to investigate defendant's new claims, the court stated, "We're set for trial. We're going to proceed on with the trial in the case." Lastly, the court granted the State's oral motion *in limine* to use the transcript of the proceedings in the event defendant testified, stating: "And if [defendant] testifies, depending on what occurs, and that choice is yours and yours alone as we've talked about previously, nobody can force or threaten you into making that decision. I'll ask for it at the appropriate time, but that will be allowed during cross examination."

¶ 13　Following the trial court's ruling, the State requested an expansion of its initial oral motion *in limine.* Specifically, the State requested the court allow the State to use Attorney Ting's statements "contained in that transcript in our case[-]in[-]chief to show the jury that he was told conflicting stories about where he was and what he was doing at the time of the crime." Attorney Ting objected to the use of the transcript as substantive evidence, stating that "as an attorney I can't be called [as] a witness" under the confrontation clause. The State responded that it would not call Attorney Ting as a witness during its case-in-chief. Rather, the State would seek to admit the relevant portions of the transcript to show defendant told Attorney Ting conflicting accounts of the incident at issue, and then "authorized his attorney to state those [disclosures] into the record here this morning." The State would ask the jury to take judicial notice of the contents of the transcript, but the State would not call Attorney Ting to testify. Attorney Ting objected, arguing that the State's use of the transcript as substantive evidence would require him to provide

6

inculpatory information against defendant, which would essentially require him to act as a witness for the State and become defendant's "accuser." Attorney Ting continued to state:

"[I]f we continue to proceed on this juncture, I will have to make an oral motion to withdraw as counsel because now we are running into a situation where it at least creates, if not directly creates, a *per se* conflict of interest or appearance of impropriety because now the State is attempting to use what I have stated through my authorization of my client against [defendant] which is understandable based on [defendant's] inconsistent statements, but nevertheless, it is something that I can't effectively represent him as well as have these statements that I have said previously before a jury."

Attorney Ting moved to withdraw as counsel for defendant.

¶ 14    Following argument by the parties, the trial court denied the State's motion to expand its prior oral motion *in limine* to utilize the attorney-client communications as substantive evidence in its case-in-chief. The court also denied Attorney Ting's motion to withdraw as counsel and stated the following:

"The case has been pending for some time. We've been in court *** multiple times on this case including at least once or twice last week on this case regarding the issues. The Court is set for trial today. The jury is here and ready to go. The Court appreciates everything everybody has presented at this point in time."

In response, Attorney Ting requested to make an offer of proof, and the court allowed it. Attorney Ting stated the following:

"I cannot compel [defendant] to testify or to not testify as this Court is well aware. If [defendant] elects to testify, then the State, based on the Court's ruling, will be able to use the transcripts of [defendant] that I made via his particular statements. In doing so, I still believe that we run afoul of an issue regarding confrontation clause rights and the like.
            Particularly, if [defendant] denies that he made those statements to me that I then made to the Court, I think the State is well within its province to then not only impeach him with those statements but to actually ask that those statements from the transcript be summitted as substantive evidence as an exhibit.
            And then we come to the same situation we're at right now ***. I truly believe by my offer of proof that this can create an actual conflict of interest merely by me [being] retained as counsel at this juncture because I can't tell [defendant] to not testify and he still exercises his right, and if he exercises his right, it's open season for the State. And if it's open season for the State and [defendant] makes statements that he did not say what he said to the effect of what the transcripts would say, then, one, the State could use this as substantive evidence, two, technically I would be an ideal rebuttal witness for the State as

7

to [defendant's] testimony that he may give.

 \*\*\* I'm just making that offer of proof because I don't know if I can truly—I will advocate, for the record, to my best ability for [defendant]."

The State responded stating that it "[would] not call [Attorney] Ting as a witness" but would "ask [defendant] impeaching questions about statements he made through counsel here today, and if [defendant] denies making those statements or the statements he made to counsel via the discovery pleading that was filed in this case, then [it] would offer into evidence the transcript. [The State] won't call Mr. Ting."

¶ 15 Prior to the trial court proceeding to *voir dire*, Attorney Ting informed the court that defendant wished to hire private counsel. Attorney Ting stated that he "indicated to [defendant] that the Court, given this late juncture, would likely deny the motion, but [he] [would] make it just for the record per his request." The court denied Attorney Ting's oral motion to continue for defendant to hire private counsel.

¶ 16 On March 3, 2020, the trial court held the second day of defendant's jury trial. From the outset, the State informed the court of two new pieces of information obtained that morning from Tamira. Specifically, Tamira informed the State that she knew Kyree, also known as Cloudy. Tamira stated that on July 29, 2019, defendant pointed a gun at Cloudy and threatened him outside Tamira's apartment, prompting Cloudy to run into her apartment through her open front door. Defendant then "busted through the door with the gun pointed at everyone in the room." The State informed the court that it promptly shared this information with Attorney Ting that morning before trial. Next, Tamira informed the State that defendant, not realizing that children were present in the apartment, apologized to Tamira for his actions after he committed the offenses. The State sought to offer defendant's apology as an admission by defendant through the testimony of Tamira. The State continued to state: "I believe the reason that we didn't know about Cloudy running in

8

the apartment before is that the victims didn't want to implicate someone else."

¶ 17    In response, Attorney Ting stated: "As to the development of the discovery, clearly [defendant] was largely at play into this newly discovered information obviously." Attorney Ting did not object to Tamira testifying about the altercation between Cloudy and defendant, stating that her testimony "[was] fair game for impeachment obviously." Attorney Ting objected, however, to the State's request to admit defendant's apology as an admission by defendant through the testimony of Tamira, arguing that defendant's alleged apology constituted hearsay, and Tamira failed to promptly disclose defendant's alleged apology, despite plenty of opportunity to do so.

¶ 18    The State responded, arguing that defendant's apology did not constitute inadmissible hearsay, given it was defendant's own statement. The State argued that the conversation between Tamira and defendant not only included defendant's apology but it "was also in the context of [defendant] describing what was happening." That is, that defendant was after Cloudy. According to the State, Tamira failed to come forward with this information to avoid implicating Cloudy, who had nothing to do with the offenses at issue but "just ran through her apartment to get away from the defendant." The trial court subsequently allowed the State's request to elicit Tamira's testimony regarding the above content.

¶ 19    Next, Attorney Ting renewed his request for a motion to continue for defendant to retain Attorney Joseph Cervantez as private counsel. Attorney Ting specifically noted that defendant's mother, Sherry Johnson, "was attempting" to hire Attorney Cervantez but "ha[d] not provided him any money at this juncture[,] but she would be willing to, and that she has a meeting with him if the Court would allow a continuance." Attorney Cervantez did not enter an appearance. The State objected, arguing that there existed "no evidence that Mr. Cervantez has even actually been retained." The trial court asked Attorney Ting if he had "[a]ny follow-up?" Attorney Ting

9

responded, "No, your Honor. It's fairly clear that Mr. Cervantez has not entered his appearance yet." The court subsequently denied defendant's renewed motion to continue, stating: "[W]e're going to proceed on to trial in the case this morning. The Court has received no entry of appearance or anything of that nature, just so the record is clear." Following opening statements, the following evidence was adduced at trial.

¶ 20    Tamira Edwards testified that she lived at the Georgetown Apartments with her two minor daughters in July 2019. On July 29, 2019, at approximately 1 p.m., multiple people were present at Tamira's apartment, including her two minor daughters, her sister, Chaquita Brinson, her friend, Jessica Penrod, as well as Brittney Taylor and Taylor's two minor sons. The front door to Tamira's apartment was open. According to Tamira, Kyree Wright,[3] also known as Cloudy, stood outside Tamira's apartment on July 29, 2019. At approximately 1 p.m., Cloudy spotted defendant walking towards him with a gun. Fearing for his life, Cloudy ran inside Tamira's apartment through the front door. After Cloudy entered the apartment, defendant, wearing a black ski mask and carrying a gun, kicked Tamira's door open and locked the door behind him. Tamira immediately instructed defendant to " 'Get out my house,' " but defendant continued to point the gun at her in front of the children. Initially, Tamira could not see defendant's face but visibly saw the gun pointed at her and the children. As defendant turned to run out of her front door, defendant took off his mask and stated, " 'I'll pay for the door.' " At that point, Tamira recognized defendant's face, indicating that she knew of him and had seen him around the Georgetown Apartments.

¶ 21    The State then asked Tamira about the alleged dispute between Cloudy and defendant. Tamira indicated that Cloudy lived in Cairo, and defendant lived in Mounds. According to Tamira, there had been "a whole riot going on between Cairo and Mounds, but their dispute was about

---

[3]Based on a review of the record, Kyree Wright and Kyree Taylor are the same individual.

10

some money. Some money came up missing. Kyree \*\*\* supposed[ly] \*\*\* took some money from [defendant]." After defendant exited Tamira's apartment, Jessica called the police. When police arrived, Tamira informed police that defendant busted through her front door and pointed a gun at her. Tamira then showed police a Facebook photo of defendant. Tamira admitted that she did not tell police about Cloudy running through her apartment because she "wasn't trying to add extra people in. He didn't do any harm. He feared for his life. He was trying to get away." Over Attorney Ting's objection, Tamira testified that she did not want to get involved in defendant's case because "bad things" can happen to people who talk to the police. Tamira admitted that she wanted to dismiss the charges against defendant after he "came to [her] a month or so later and apologized." Specifically, Tamira testified that defendant admitted to busting down her door, pointed a firearm at her, and apologized because "it was eating him up because he didn't think the kids was [*sic*] in the house." According to Tamira, defendant told her about his "beef" with Cloudy. Following defendant's apology, Tamira requested that the State drop the charges against defendant. Tamira admitted that she did not tell the State or police about defendant's apology or that defendant chased after Cloudy.

¶ 22    On cross-examination, Tamira testified that she did not lie to police following the incident at issue. Tamira admitted that she did not inform police that Cloudy was present at her house on July 29, 2019. Tamira did not tell police that defendant chased Cloudy into her house with a gun, or that defendant searched for Cloudy in her apartment. Tamira admitted that she did not tell police that defendant apologized to her. Instead, Tamira told the State for the first time that morning that defendant apologized to her. She asserted that she did not want to get Cloudy in trouble, stating: "He didn't do anything. He feared for his life." Again, Tamira testified that defendant pointed a gun at her on July 29, 2019. She also admitted that she withheld information from the State and

11

police for months and affirmatively took steps to conceal Cloudy's identity.

¶ 23    On redirect examination, Tamira testified that she requested the State dismiss the charges against defendant because he apologized, noting that she no longer held a grudge against him. She clarified that she told police that defendant busted down her door, and that defendant, while carrying a gun and initially concealing his identity with a black ski mask, pointed a real gun at her and "everyone in the room." On recross-examination, Tamira, again, admitted multiple times that she withheld information from police and the State, including that Cloudy, who apparently owed defendant money, ran through her apartment away from defendant. Tamira reiterated that defendant held a real gun, stating: "I just seen [*sic*] *** [a] black gun."

¶ 24    Next, Jessica Penrod testified that she visited Tamira's apartment on July 29, 2019. At approximately 1 p.m., Jessica sat on a long couch by the front door when Cloudy ran through Tamira's open door. He then closed and locked the door behind him. Subsequently, defendant kicked open the front door and entered Tamira's apartment holding a gun and pointing it at Tamira, who immediately requested him to leave. Initially, Jessica could not see defendant's face. However, she saw defendant's face after he pulled down his ski mask. Jessica testified that defendant held a silver .40-caliber, semiautomatic gun. Familiar with guns herself, Jessica "knew [the gun] was real" when she saw it in defendant's hand. When asked why defendant entered her apartment with a gun and a black ski mask, Jessica responded, "I just know it was over some money or something. I'm not really sure."

¶ 25    After defendant exited Tamira's apartment, Jessica called 9-1-1. The State then played Jessica's 9-1-1 call for the jury. Jessica agreed that she told the 9-1-1 dispatcher that someone wearing a mask busted down the door while she was sitting on a couch with children in Tamira's apartment. Jessica shared the same information with police. Jessica also told the dispatcher that

12

someone waved a gun around when they came into the apartment. Jessica shared the same information with police. Specific to the 9-1-1 audio recording, Jessica informed the dispatcher that the gun was "gray .40." Jessica testified that, in her mind, silver, gray, and chrome are "all the same [color]." Jessica clarified that she saw the side of the gun, while Tamira stood directly in front of defendant. Next, Jessica admitted that she did not want to get involved with the police investigation, so she did not share the names of those involved or defendant's race with the dispatcher. However, when police arrived, Jessica and Chaquita informed police that defendant busted down Tamira's door and waved a gun at everyone inside the house. Jessica admitted that she did not tell police that Cloudy ran through Tamira's apartment and did not provide a written statement because she "[d]idn't want to involve anybody else."

¶ 26     On cross-examination, Jessica admitted again that she did not provide defendant's name or race to the 9-1-1 dispatcher, even though she knew defendant was the assailant. In an attempt to discredit Jessica's credibility, Attorney Ting played a portion of the 9-1-1 audio recording where Jessica informed the dispatcher that children and two other adults were in the house at the time of the incident. Jessica testified, however, that four adults, including herself, were present, admitting that she incorrectly stated the number of adults to the dispatcher. She responded stating, "It was happening so fast." She also admitted that she did not mention Cloudy's name "because he ran through the house." She also admitted that she did not share Cloudy's name or that he was in Tamira's home with police or the State until almost a year after the incident. She acknowledged that she told the dispatcher that defendant held an "all gray" gun, although she testified on direct examination that the gun was silver.

¶ 27     The State also called Officer Brandon Weisenberger, a patrol officer with the Carbondale Police Department, to testify. Officer Weisenberger arrived at the Georgetown Apartments on July

13

29, 2019, following a report of a home invasion. When he arrived, he met Tamira, Jessica, and Chaquita. There were no children present at that time. The following colloquy took place between the State and Officer Weisenberger:

"Q. [MR. CLARK]: I want to talk to you about the nature of your investigation at that point. Were you looking for an armed home invader?
A. Yes.
Q. Were you looking for a particular person?
A. Yes, sir.
Q. And how did you know who to look for?
A. The individuals that I interviewed, the three females, identified the suspect.
Q. Did they identify a person by the name of Cloudy?
A. Yes.
Q. Did they say that was the suspect?
A. No.
Q. What did they tell you about Cloudy?
A. Cloudy was an acquaintance of Ms. Edwards who occasionally frequented that apartment, 10B. That's what they initially told me.
Q. What relevance was this Cloudy to your investigation?
A. Ms. Edwards reported that on the last time that Cloudy was at her apartment he had discussed how he was in some sort of unspecified altercation or disagreement with the defendant. Ms. Edwards, when asked by me for a motive for what had happened, she said that the defendant was most likely looking for Cloudy.
Q. Now, just so I'm clear, no one ever told you that Cloudy was present?
A. Correct.
Q. And was this information about Cloudy, it surrounded the motive for what happened?
A. Yes, sir.
Q. And so was that a primary focus of what you were doing or were you trying to find the defendant?
A. It was not a primary focus.
Q. Did you spend very much time talking to them about Cloudy?
A. No sir.
Q. How were you able to identify the defendant as the perpetrator?
A. The three individuals said that they recognized the suspect as somebody that they knew by the name of Jay, J-A-Y. Ms. Edwards said she knew Jay to have a Facebook profile, and she showed that to me. The main page of the profile showed a picture of a black male with a name what's commonly known as a screen name below that photograph. That name was Jay, J-A-Y, Gold, G-O-L-D."

Officer Weisenberger looked at the Facebook URL, which showed the full name as Jaymond Palacio. According to Officer Weisenberger, Tamira, Jessica, and Chaquita consistently described

14

the incident to him.

¶ 28   On cross-examination, Officer Weisenberger clarified that he spoke to Tamira, Jessica, and Chaquita in the same room, however, "it was not a situation where everybody was talking over each other. Everybody was addressed individually *** with access to hearing each other[']s statements." Officer Weisenberger acknowledged that Tamira, Jessica, and Chaquita never told him that Cloudy was present in the apartment on July 29, 2019. In addition, he acknowledged that, despite asking the women for Cloudy's social media address, contact information, and legal name, they did not provide the requested information. Officer Weisenberger also acknowledged that a fourth individual, Brittney Taylor, was present at the time of the incident. He did not speak to Brittney and the women failed to provide Brittney's contact information. In addition, Officer Weisenberger admitted that the women informed him that defendant's gun was silver.

¶ 29   On redirect examination, Officer Weisenberger testified that victims can make mistakes about details, due to the stress of being victimized. The following conversation took place, without objection by Attorney Ting:

> "Q. [THE STATE]: But in your experience, when you have three victims all telling you substantially the same thing about the big issues about what happened here, what do you do with that? What do you think about that?
> A. I assign a higher level of credibility to those statements.
> Q. And if a victim makes a mistake about a detail that has nothing to do with identifying, you know, describing what happened, do you give that less weight or do you think it's not as significant as if they were completely telling you that someone different came in the apartment, for example?
> A. Correct.
> Q. Did you get any contradictory stories about who did this?
> A. No, sir."

Officer Weisenberger reiterated that Tamira, Jessica, and Chaquita all stated that defendant kicked open Tamira's door and pointed a gun at them. There were no conflicting accounts as to the assailant.

15

¶ 30      On recross-examination, the following conversation took place between Attorney Ting and Officer Weisenberger:

> "Q. [The State] asked you questions about credibility, correct?
> A. Yes, sir.
> Q. And he asked you things like, 'If witnesses are consistent, that enhances their credibility,' correct?
> A. Correct.
> Q. If witnesses are consistently lying to you, that decreases their credibility, correct?"

The State objected, and the trial court sustained the objection. The following colloquy took place:

> "Q. [ATTORNEY TING]: *** What do you think when witnesses collectively give you consistent testimony?
> A.  That enhances their credibility in my eyes.
> Q. Ah, okay. What would you think if witnesses consistently give you testimony or they give you statement[s] that you later find out to be untrue?
> A. That obviously would have the alternate effect.
> Q. And by 'alternate effect,' you mean it decreases their credibility, correct?
> A. Correct.
> Q. And if there are multiple instances where they have consistently failed to provide information to you that you have specifically requested that they knew at the time when you requested, would that further decrease their credibility?
> A. That's a fair statement.
> Q. So when you specifically asked for relevant information like who was in the apartment and they failed to say who was in the apartment, would that decrease their credibility?
> A. Sure. Yes, sir.
> Q. And if you specifically asked for contact information for people who are in the apartment and they failed to give that to you, would that decrease their credibility?
> A. If they knew it and said they didn't, yes, sir."

Officer Weisenberger further stated that Tamira, Jessica, and Chaquita failed to provide Cloudy's legal name, contact information, and social media accounts, as well as Brittney's whereabouts. Following the close of evidence, the jury found defendant guilty on all counts.

¶ 31      On March 19, 2020, Attorney Ting filed a motion to withdraw as counsel. Attorney Ting also requested the court appoint counsel for defendant and grant an extension of time for new counsel to file any appropriate posttrial motion. The trial court granted Attorney Ting's motion,

appointed Attorney Celeste Korando to represent defendant, and permitted Attorney Korando time for leave to file a posttrial motion.

¶ 32    On December 14, 2020, Attorney Korando filed a motion for a new trial claiming, without argument, that defendant received ineffective assistance of counsel, and that the State failed to prove defendant guilty beyond a reasonable doubt. Attorney Korando also argued that the trial court erred by failing to grant Attorney Ting's oral motions to withdraw as defendant's counsel on March 2 and 3, 2020.

¶ 33    On December 16, 2020, the trial court held a hearing on defendant's motion for a new trial and defendant's sentencing hearing. The court denied defendant's motion for a new trial following argument by the parties. Next, following a full sentencing hearing, the court sentenced defendant to concurrent terms of 27 years in prison on count I to be served 50% with 3 years' mandatory supervised release (MSR), 6 years in prison on count II to be served 50% with 1 year of MSR, and 6 years in prison on count III to be served 50% with 2 years of MSR. Defendant filed a timely notice of appeal.

¶ 34                                    II. Analysis

¶ 35    On appeal, defendant argues that the trial court (1) violated his sixth amendment right to conflict-free counsel by denying trial counsel's motion to withdraw, where *per se* and actual conflicts of interest existed, (2) abused its discretion by denying defendant's motion for a continuance to obtain new counsel, and (3) erred by sentencing defendant to six years in prison on the felony offense of criminal damage to property. Defendant also argues that trial counsel was ineffective for failing to object to inadmissible prior consistent statements and improper hearsay evidence. We address defendant's contentions in turn.

17

¶ 36    A. Sentencing

¶ 37    Defendant requests this court order the trial court to correct the mittimus to reflect defendant's conviction for a Class A misdemeanor of the offense of criminal damage to property, not a Class 4 felony of the offense of criminal damage to property. The State concedes. As such, this court reduces defendant's conviction from a Class 4 felony to a Class A misdemeanor and remands for resentencing on the Class A misdemeanor. See Ill. S. Ct. R. 615(b)(3) (eff. Jan. 1, 1967).

¶ 38    B. Defendant's Right to Conflict-Free Representation

¶ 39    Next, we address defendant's argument that the trial court violated his sixth amendment right to counsel by denying Attorney Ting's motions to withdraw as counsel. A criminal defendant's constitutional right to effective assistance of counsel encompasses the right to conflict-free representation. *People v. Green*, 2020 IL 125005, ¶ 20. "Conflict-free representation means 'assistance by an attorney whose allegiance to his client is not diluted by conflicting interests or inconsistent obligations.' " *Id.* (quoting *People v. Spreitzer*, 123 Ill. 2d 1, 13-14 (1988)). Illinois courts have recognized two categories of conflicts of interest: *per se* and actual. *Id.*; *People v. Fields*, 2012 IL 112438, ¶ 17.

¶ 40    A "*per se* conflict exists where certain facts about a defense attorney's status, by themselves, engender a disabling conflict." *Fields*, 2012 IL 112438, ¶ 17. For example, a *per se* conflict exists where the "defendant's attorney has a tie to a person or entity that would benefit from an unfavorable verdict for the defendant." *Id.* Our supreme court identified three situations where a *per se* conflict will be found to exist (1) where trial counsel has a prior or contemporaneous relationship or association with a victim, the prosecution, or an entity assisting the prosecution; (2) where trial counsel contemporaneously represents a prosecution witness; and (3) where

18

defense counsel was a former prosecutor who had been personally involved with the prior prosecution of the defendant. *Green*, 2020 IL 125005, ¶ 24. "[I]n each situation, the defense counsel's association or tie to the victim, the prosecution, or a prosecution witness may have subtle or subliminal effects on counsel's performance that are difficult to detect and demonstrate." *People v. Peterson*, 2017 IL 120331, ¶ 103. Ultimately, "[w]hen deciding whether a *per se* conflict of interest exists, the reviewing court should make a 'realistic appraisal of defense counsel's professional relationship to someone other than the defendant under the circumstances of each case.' " *People v. Austin M.*, 2012 IL 111194, ¶ 83 (quoting *People v. Daly*, 341 Ill. App. 3d 372, 376 (2003)). Where the underlying facts are not in dispute, the issue of whether a *per se* conflict of interest exists is a legal question reviewed *de novo. Fields*, 2012 IL 112438, ¶ 19.

¶ 41     Here, defendant first submits that Attorney Ting had a *per se* conflict of interest, where he had an ongoing " 'contemporaneous association' " with the State as a potential witness for the prosecution and, thus, became defendant's " 'accuser.' " We cannot agree. It is undisputed that Attorney Ting did not have any employment ties to the state's attorney's office before or at the time he represented defendant. There is no evidence that Attorney Ting contemporaneously represented defendant and a prosecution witness or had a prior or contemporaneous relationship with a victim, prosecution, or an entity assisting the prosecution. The record only reveals that trial counsel taught criminal procedure outside of his role as a public defender. Moreover, the record reveals that Attorney Ting was not a potential witness for the State. In fact, the court denied the State's oral motion *in limine* to use Attorney Ting's statements in its case-in-chief, and the State stated multiple times on the record that it "[would] not call [Attorney] Ting as a witness." The State would, however, use the transcripts from the hearing to impeach defendant, in the event that defendant testified and denied the statements that Attorney Ting stated on the record before the

19

court on March 2, 2020. We, thus, cannot find that a *per se* conflict of interest existed in this case.

¶ 42 Alternatively, defendant argues that Attorney Ting had an actual conflict of interest that adversely affected his performance. For support, defendant argues that Attorney Ting "unnecessarily revealed communications protected by the attorney-client privilege without first advising [defendant] that the statements could be used against him." He also argues that Attorney Ting's disclosure to the court "dramatically impaired [defendant's] ability to testify at trial," affecting counsel's "role in the litigation and heavily influenc[ing] his advice to [defendant] that he not take the stand." We cannot agree.

¶ 43 To find the existence of an actual conflict of interest, we must conduct a two-step analysis. *People v. Hayes*, 2024 IL App (5th) 210368, ¶ 43 (citing *People v. Hampton*, 2021 IL App (5th) 170341, ¶ 111). The first step is to determine if, in fact, a conflict exists. *Id.* Once a conflict is identified, then the second step is to demonstrate that the conflict adversely affected counsel's performance by pointing to a specific defect in counsel's performance that is attributable to the conflict. *Id.* Mere "[s]peculative allegations and conclusory statements are not sufficient to establish that an actual conflict of interest affected counsel's performance." *People v. Morales*, 209 Ill. 2d 340, 349 (2004) (citing *People v. Williams*, 139 Ill. 2d 1, 12 (1990)). An actual conflict of interest "generally, if not exclusively, involves joint or multiple representation." *Austin M.*, 2012 IL 111194, ¶ 82.

¶ 44 Here, an actual conflict of interest never manifested. We note that the *possibility* of a conflict of interest could have taken place had defendant taken the stand and denied the statements that Attorney Ting stated before the trial court on March 2, 2020. Even if we were to assume, *arguendo*, that an actual conflict did exist, defendant argues that the possible impeachment of defendant "heavily influenced" Attorney Ting's advice for defendant not to take the stand. We

20

disagree. First, we note that defendant fails to cite to any case law in which a court found that the mere possibility that a defense attorney could be called as a witness to testify against his client could impact their professional obligations to defendant, especially where the record in this case reveals the State affirmatively stated on the record that it would not call counsel to testify at defendant's trial. Moreover, Attorney Ting shared on the record that he informed defendant multiple times, both before defendant's trial and prior to defendant choosing not to testify, of his constitutional right to testify and of any potential ramifications of defendant choosing to testify or not testify.

¶ 45    Furthermore, we note that defendant's argument on appeal lacks merit, where he asserts that Attorney Ting "unnecessarily revealed" attorney-client privilege communications. The record indicates that the trial court admonished defendant before Attorney Ting provided the court with the privileged attorney-client communications at issue. Defendant agreed on the record that he approved Attorney Ting to present the communications before the court and that no one forced or threatened him to make this decision. In addition, Attorney Ting had a professional obligation, both legal and ethical, not to pursue defendant's alibi defense at trial once defendant informed Attorney Ting—for the first time on the morning of defendant's jury trial—that he was present at or near Tamira's apartment at the time of the alleged offense. See *People v. Morris*, 335 Ill. App. 3d 70, 79 (2002) ("Attorneys have an obligation to explore all readily available sources of evidence that might benefit their clients." (citing *Brown v. Sternes*, 304 F.3d 677, 693 (7th Cir. 2002), citing *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997))). As such, Attorney Ting's obligation to the court required him to provide the court with the necessary disclosures when arguing that the defense needed a continuance to proceed forward with an entirely new defense on the first day of his trial. Attorney Ting did this following the court's admonishment of defendant. See *Sinram v.*

21

*Nolan*, 227 Ill. App. 3d 241, 243 (1992) (If a continuance is requested on the date of the trial, the moving party "must give especially persuasive reasons for the continuance because of the potential inconvenience to the witnesses, the parties, and the court."). We, thus, cannot find that an actual conflict of interest existed in this case. Accordingly, we cannot conclude that the trial court violated defendant's sixth amendment right to conflict-free representation when it denied counsel's motion to withdraw.

¶ 46    C. Defendant's Right to Counsel of Choice

¶ 47    Next, defendant argues that the trial court abused its discretion by denying defendant a continuance to obtain new counsel in violation of his right to his counsel of choice. The determination whether to grant a continuance for substitution of counsel is a matter left to the discretion of the trial court, and such determination will not be overturned absent an abuse of that discretion. *People v. Howery*, 178 Ill. 2d 1, 49 (1997). "It is within the discretion of the trial court to determine when the defendant's right to select counsel unreasonably interferes with the orderly process of judicial administration." *People v. Burrell*, 228 Ill. App. 3d 133, 142 (1992) (citing *People v. Spurlark*, 67 Ill. App. 3d 196, 197 (1978)). A determination of the issue turns on the particular facts of each case. *People v. Little*, 207 Ill. App. 3d 720, 724 (1990). "In balancing the judicial interest of trying the case with due diligence and the defendant's constitutional right to counsel of choice, the court must inquire into the actual request to determine whether it is being used merely as a delaying tactic." *Burrell*, 228 Ill. App. 3d at 142. Factors include: "(i) defendant's articulation of an acceptable reason for desiring new counsel, (ii) defendant's continuous custody, (iii) defendant's efforts in obtaining new counsel, (iv) defendant's cooperation with current counsel, and (v) the length of time current counsel represented defendant." (Internal quotation marks omitted.) *People v. Jenkins*, 2020 IL App (1st) 172422, ¶ 13; *Burrell*, 228 Ill. App. 3d at

22

142. It is well established, however, that a trial court does not abuse its discretion by denying a motion to continue for substitution of counsel "if new counsel is not specifically identified or does not stand ready, willing, and able to make an unconditional entry of appearance instanter." *Burrell*, 228 Ill. App. 3d at 142; see also *People v. Segoviano*, 189 Ill. 2d 228, 245 (2000) ("[T]rial court will not be found to have abused its discretion in denying a motion for substitution of counsel in the absence of ready and willing substitute counsel.").

¶ 48    Here, we first note that the trial court did not specifically inquire at the end of the first day of trial and beginning of the second day of trial whether defendant requested a continuance to hire private counsel as a delaying tactic. Defendant cites *People v. Adams*, 2016 IL App (1st) 141135, ¶¶ 15-17, for the proposition that the court's failure in the instant case requires reversal. We cannot agree. In *Adams*, the defendant, against his counsel's advice, requested " 'a continuance to get me [*sic*] a private attorney?' " *Id.* ¶ 4. The court, without any inquiry into the defendant's reasoning behind his request, denied his oral motion, stating: " '[H]ere is the whole thing. If this wasn't the day of trial, then you would have a right to do that. But this is the day of trial[,] and everybody is here.' " *Id.* Dissimilar to *Adams*, here, there was ample argument before the court as to defendant's request to hire private counsel on the first day of his trial and then on the morning of the second day of trial when Attorney Ting specifically identified Attorney Cervantez as defendant's intended counsel. Unlike in *Adams*, here, the court heard ample argument from both parties that defendant requested a continuance to hire new counsel due to Attorney Ting's arguments concerning his belief that *per se* and actual conflicts existed following defendant's disclosures that completely undermined defendant's alibi defense. As such, we cannot say that the court lacked knowledge, requiring further inquiry into defendant's motives for seeking alternate counsel. Rather, the record reveals that the court was well aware of defendant's motives for seeking new counsel and took the

factors listed above into consideration when denying his motion to continue. Moreover, trial counsel's requests to continue defendant's jury trial did not contain a representation that defendant secured substitute counsel or that substitute counsel was ready and willing to enter an appearance in the case. See *Burrell*, 228 Ill. App. 3d at 142; see also *Segoviano*, 189 Ill. 2d at 245 ("[T]rial court will not be found to have abused its discretion in denying a motion for substitution of counsel in the absence of ready and willing substitute counsel."). Accordingly, we cannot conclude that the trial court abused its discretion in denying Attorney's Ting's oral motions to continue.

¶ 49    D. Ineffective Assistance of Counsel

¶ 50    Next, defendant argues Attorney Ting was ineffective where he failed to object to (1) inadmissible prior consistent statements purportedly made by Tamira, Jessica, and Officer Weisenberger that improperly bolstered their credibility, and (2) improper hearsay and speculative testimony about defendant and Cloudy's encounter. We cannot agree.

¶ 51    1. Prior Consistent Statements

¶ 52    We first note that defendant failed to object to and raise these issues presented on appeal in his motion for a new trial. As such, defendant failed to preserve these issues for review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (a defendant forfeits review of an issue if he fails to object at trial and raise the issue in a posttrial motion). Alternatively, defendant asks this court to consider whether Attorney Korando provided ineffective assistance by failing to raise these issues in defendant's posttrial motion. "To prevail on an ineffective-assistance-of-counsel claim, defendant must show that his attorney's representation was objectively unreasonable and that he was prejudiced by that representation." *People v. Reber*, 2019 IL App (5th) 150439, ¶ 82 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "This standard requires a finding that it is reasonably probable that the defendant would not have been convicted if his attorney had not

24

committed error." *Id.* (citing *Strickland*, 466 U.S. at 687).

¶ 53    Defendant asserts that "[t]he only evidence connecting [defendant] to the crime was the questionable testimony provided by Tamira Edwards and Jessica Penrod." As such, defendant asserts now that trial counsel should have objected to the State's questioning that improperly bolstered Tamira's and Jessica's credibility by introducing prior consistent statements made to police after the incident. Specifically, Tamira testified that she told police she was present in her apartment when defendant "busted through her door and was pointing a gun at [her]." Tamira also testified that she showed police a Facebook photo of defendant, stating: "That's the guy who did it." Next, Jessica testified that she told police that she was sitting on a couch in Tamira's apartment with two adults and children when defendant "busted through the door" and waved a gun around. While speaking to police, Jessica testified that she and Chaquita identified defendant as the assailant. In response, the State contends that the statements of Tamira and Jessica were properly admitted as prior identification under section 115-12 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-12 (West 2020)). We agree with the State.

¶ 54    Generally, a party may not bolster the credibility of its own witnesses on direct examination by introducing their prior consistent statements. *People v. Dupree*, 2014 IL App (1st) 111872, ¶ 42; *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 60. "The danger in prior consistent statements is that a jury is likely to attach disproportionate significance to them. People tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve." (Internal quotation marks omitted.) *Johnson*, 2012 IL App (1st) 091730, ¶ 60. But it is well established that "this rule does not apply to statements of identification." *People v. Temple*, 2014 IL App (1st) 111653, ¶ 34 (citing *People v. Shum*, 117 Ill. 2d 317, 342 (1987); *People v. Tisdel*, 201 Ill. 2d 210, 217 (2002)). Under section

25

115-12 of the Code, "[a] statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2020). Such statements are admissible as substantive evidence. *People v. Williams*, 193 Ill. 2d 306, 359 (2000).

¶ 55 Here, it is undisputed that both Tamira and Jessica testified at defendant's jury trial and were subject to cross-examination concerning their statements to police. The issue, thus, is whether Tamira's and Jessica's statements to police constitute statements of identification. Our supreme court defined " 'statements of identification' " broadly to encompass "the entire identification process." *Tisdel*, 201 Ill. 2d at 219. Section 115-12 of the Code, however, does "not allow the admission of every discussion between a [witness] and a police officer, only those pertaining to identification of a person made after perceiving him." *People v. Newbill*, 374 Ill. App. 3d 847, 853 (2007). That said, when admitting a prior identification as substantive evidence under section 115-12 of the Code, testimony may include a description of the offense " 'only to the extent necessary to make the identification understandable to the jury,' but it may not go beyond that to provide 'detailed accounts of the actual crime.' " *People v. Anderson*, 2018 IL App (1st) 150931, ¶ 42; see also *Shum*, 117 Ill. 2d at 333; *Tisdel*, 201 Ill. 2d at 219 (Our supreme court expanded exception to hearsay rule concerning statements of identification to include "the entire identification process would ensure that a trier of fact is fully informed concerning the reliability of a witness' identification, as well as the suggestiveness or lack thereof in that identification."); *Temple*, 2014 IL App (1st) 111653, ¶ 41.

¶ 56 Based on this standard, we cannot conclude that Tamira's and Jessica's testimonies regarding their prior identifications of defendant were improperly admitted. Shortly after Jessica

26

called 9-1-1, Tamira identified defendant to police as the person who busted through her door with a ski mask on and pointed a gun at her. Tamira also identified defendant in a Facebook photo, sharing with police that defendant was "the guy who did it." In addition, Jessica spoke with police shortly after the incident, at which time she stated that she was present in Tamira's apartment when defendant busted through the front door wearing a ski mask, entered the apartment, and waved a gun around. Jessica also testified that both her and Chaquita identified defendant as the assailant while speaking to police. As such, we conclude that the witnesses' statements regarding defendant's description at the time of the offense constituted statements of identification that provided the jury with a description of the offense necessary to make the identification of defendant understandable. See *Anderson*, 2018 IL App (1st) 150931, ¶ 42.

¶ 57    Accordingly, where the statements were properly admitted under section 115-12 of the Code, we find defendant's argument meritless that Attorney Korando's performance amounted to ineffective assistance of counsel for not including the above issues in defendant's posttrial motion. See *Reber*, 2019 IL App (5th) 150439, ¶ 82 ("To prevail on an ineffective-assistance-of-counsel claim, defendant must show that his attorney's representation was objectively unreasonable and that he was prejudiced by that representation.").

¶ 58    In addition, the testimony of Officer Weisenberger regarding the prior consistent statements of identification made by Tamira and Jessica also falls under the purview of section 115-12 of the Code. *Shum*, 117 Ill. 2d at 342 (where witnesses testify that they previously identified an offender and those witnesses have been cross-examined, a third party may testify that he heard or saw that witness identify the offender); *People v. Lewis*, 223 Ill. 2d 393, 402-03 (2006) ("The plain language of section 115-12 requires the declarant to testify and be subject to cross-examination on the identification statement. [Citation.] There are no other requirements for

admission of a third party's testimony about the declarant's out-of-court identification."); see also

*Temple*, 2014 IL App (1st) 111653, ¶ 42. Because Tamira's and Jessica's statements were properly

admitted under section 115-12 of the Code, the court properly admitted Officer Weisenberger's

testimony about similar statements.

¶ 59    Moreover, defendant argues that Officer Weisenberger's testimony on redirect

examination improperly bolstered the credibility of Tamira, Jessica, and Chaquita. Because

questions of credibility are to be resolved by the trier of fact, "it is generally improper to ask one

witness to comment directly on the credibility of another witness." *People v. Becker*, 239 Ill. 2d

215, 236 (2010). "[O]ne witness should not be allowed to express his opinion as to another

witness's credibility." *People v. Henderson*, 394 Ill. App. 3d 747, 754 (2009).

¶ 60    Here, Officer Weisenberger testified on cross-examination that the women failed to

provide him with several pieces of information, including: (1) Cloudy's presence in the apartment

on July 29, 2019; (2) Cloudy's social media address, contact information, and legal name;

(3) Brittney Taylor's contact information and whereabouts; and (4) that each woman had vague

familiarity with guns but informed Officer Weisenberger that the gun in defendant's hand was

silver. A review of Officer Weisenberger's redirect examination demonstrates that he did not

vouch for the women's credibility. He first spoke generally—not speaking specifically about

Tamira, Jessica, and Chaquita—that victims can make mistakes about details, due to the stress of

being victimized. He then merely stated that, in his experience as an officer, when three victims

consistently tell the same story about the "big issues," this usually leads him to assign more weight

or credibility to those statements than if the victims made mistakes about smaller details not

associated "with identifying [or] describing what happened." Officer Weisenberger then stated that

Tamira, Jessica, and Chaquita all identified defendant, and no one else, as the individual who

busted down Tamira's door and pointed a gun at them. There were no conflicting accounts as to who the assailant was on July 29, 2019.

¶ 61    As such, in this instance, the jury was still left to determine for themselves whether the story they heard from Tamira and Jessica at trial was believable or not. Thus, we cannot conclude that Officer Weisenberger's general comments violated the general rule vesting decisions of credibility to the exclusive province of the jury. See *Becker*, 239 Ill. 2d at 236. Accordingly, we find defendant's argument meritless that Attorney Korando's performance amounted to ineffective assistance of counsel for not including this issue in defendant's posttrial motion. See *Reber*, 2019 IL App (5th) 150439, ¶ 82 ("To prevail on an ineffective-assistance-of-counsel claim, defendant must show that his attorney's representation was objectively unreasonable and that he was prejudiced by that representation.").

¶ 62    2. Hearsay

¶ 63    Lastly, defendant argues that trial counsel failed to object to Tamira's and Officer Weisenberger's inadmissible hearsay testimony "that the altercation [between defendant and Cloudy] was related to their association with Mounds and Cairo," which allowed the jury to infer that defendant was involved in group criminality and the incident at issue with Cloudy resulted from such involvement.

¶ 64    We first note that defendant failed to object to and raise these issues presented on appeal in his motion for a new trial. As such, defendant failed to preserve these issues for review. *Enoch*, 122 Ill. 2d at 186 (a defendant forfeits review of an issue if he fails to object at trial and raise the issue in a posttrial motion). Alternatively, defendant asks this court to consider whether Attorney Korando provided ineffective assistance by failing to raise the issues in a posttrial motion. "To prevail on an ineffective-assistance-of-counsel claim, defendant must show that his attorney's

representation was objectively unreasonable and that he was prejudiced by that representation." *Reber*, 2019 IL App (5th) 150439, ¶ 82 (citing *Strickland*, 466 U.S. at 687). "This standard requires a finding that it is reasonably probable that the defendant would not have been convicted if his attorney had not committed error." *Id.* (citing *Strickland*, 466 U.S. at 687).

¶ 65    Defendant asserts that trial counsel's deficient performance—failing to object to this testimony concerning the alleged altercation—created a reasonable probability of a different result, depriving defendant of a fair trial. We note that defendant argues in his opening brief that Tamira's and Officer Weisenberger's testimonies "about the altercation was hearsay, offered to show [defendant's] motive in going into [Tamira's] apartment." The State, agreeing with defendant's own statement in his brief, asserts that the testimony stated above was offered to show that defendant's motive when he kicked down Tamira's front door was to run after Cloudy. As such, the State argues that the testimony was not hearsay, that is, not offered for "the truth of the matter asserted," but to show defendant's motive. In his responsive brief, defendant, for the first time, cites to case law and argues the following:

> "This motive testimony, however, was couched in the context of gang activity, which is the type of out-of-court testimony trial courts may not permit without the State making a clear connection between the gang identification and the crime in question—a connection the State did not make, nor a connection that the trial court even attempted to analyze."

Thus, defendant maintains trial counsel's performance was objectively unreasonable for failing to object. We cannot agree.

¶ 66    " 'Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and it is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule.' " *People v. Caffey*, 205 Ill. 2d 52, 88-89 (2001) (quoting *People v.*

*Olinger*, 176 Ill. 2d 326, 357 (1997)). When an out-of-court statement is offered for some purpose other than to establish the truth of the matter asserted, the statement is not hearsay and is admissible. *People v. Williams*, 181 Ill. 2d 297, 313 (1998). It is well settled that an out-of-court statement is admissible under an exception to the hearsay rule when it shows the declarant's state of mind, such as intent, plan, motive, or design. See *People v. Lawler*, 142 Ill. 2d 548, 559 (1991); *People v. Floyd*, 103 Ill. 2d 541, 546 (1984)).

¶ 67     We initially note that defendant argues for the first time in his reply brief that the motive testimony of Tamira and Officer Weisenberger "was couched in the context of gang activity," which the State failed to make "a clear connection between the gang identification and the crime in question." As such, defendant has forfeited his argument concerning gang activity on review. See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) ("Points not argued [in the opening brief] are waived and shall not be raised in the reply brief ***."). Next, we agree that the testimony at issue was not offered for the truth of the matter asserted—that Cloudy owed defendant money—but to prove defendant's motive to kick down Tamira's door, enter her apartment, and wave a gun at the individuals inside while in search of Cloudy. Accordingly, we find defendant's argument meritless that Attorney Korando's performance amounted to ineffective assistance of counsel for not including this issue in defendant's posttrial motion.

¶ 68                                                III. Conclusion

¶ 69     For the reasons stated, we affirm defendant's convictions for home invasion, criminal damage to property, and unlawful possession of a weapon by a felon. We, however, vacate defendant's sentence for criminal damage to property as a Class 4 felony and remand the matter for resentencing on a Class A misdemeanor.

¶ 70    Affirmed in part and vacated in part; cause remanded with directions.